IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
ST. JOSEPH DIVISION

STEVEN SHAW,                          )
                                      )
            Plaintiff,                )
                                      )
            v.                        ) Case No.
                                      ) 12–6152–CV–SJ–REL–SSA
CAROLYN W. COLVIN, Acting             )
Commissioner of Social Security,      )
                                      )
            Defendant.                )

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Steven Shaw seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) assessing plaintiff's residual functional capacity without explaining in detail what medical and non-medical evidence she utilized, and (2) failing to give controlling weight to the Medical Source Statement – Mental of plaintiff's treating physician Eric Sollars, M.D. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.   *BACKGROUND*

On March 16, 2010, plaintiff applied for disability benefits alleging that he had been disabled since April 10, 2009, when he was 24 years of age. Plaintiff's disability stems from Attention

Deficit Hyperactivity Disorder ("ADHD").  Plaintiff's application
was denied on June 4, 2010.  On September 9, 2011, a hearing was
held before an Administrative Law Judge.  On October 28, 2011,
the ALJ found that plaintiff was not under a "disability" as
defined in the Act.  On October 22, 2012, the Appeals Council
denied plaintiff's request for review.  Therefore, the decision
of the ALJ stands as the final decision of the Commissioner.

## II.  *STANDARD FOR JUDICIAL REVIEW*

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for
judicial review of a "final decision" of the Commissioner.  The
standard for judicial review by the federal district court is
whether the decision of the Commissioner was supported by
substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales,
402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847,
850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th
Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir.
1996).  The determination of whether the Commissioner's decision
is supported by substantial evidence requires review of the
entire record, considering the evidence in support of and in
opposition to the Commissioner's decision.  Universal Camera
Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876
F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into
consideration the weight of the evidence in the record and apply
a balancing test to evidence which is contradictory."  Wilcutts

v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857

(8th Cir. 2000); <u>Brock v. Apfel</u>, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, <u>et seq.</u> The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1. Is the claimant performing substantial gainful activity?

        Yes = not disabled.
        No = go to next step.

2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

        No = not disabled.
        Yes = go to next step.

3. Does the impairment meet or equal a listed impairment in Appendix 1?

        Yes = disabled.
        No = go to next step.

4. Does the impairment prevent the claimant from doing past relevant work?

        No = not disabled.
        Yes = go to next step where burden shifts to Commissioner.

5. Does the impairment prevent the claimant from doing any other work?

        Yes = disabled.
        No = not disabled.

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Marianne Lumpe, in addition to documentary evidence admitted at the hearing.

### A. EARNINGS RECORD

The record shows that plaintiff earned the following income:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 2003 | $ 167.04 | 2007 | $ 8,511.64 |
| 2004 | 0.00 | 2008 | 13,393.40 |
| 2005 | 9,004.85 | 2009 | 5,410.57 |
| 2006 | 11,320.18 | | |

(Tr. at 115).

### B. ADMINISTRATIVE REPORTS AND MEDICAL RECORDS

On October 17, 2008, plaintiff went to the emergency room complaining of waking up and coughing and then having chest pain with deep breathing and coughing (Tr. at 281-283). He had no other complaints of any kind. Plaintiff reported smoking a half a pack of cigarettes per day. He was observed to be alert and oriented times three. He was assessed with upper respiratory infection.

On December 10, 2008, plaintiff went to the emergency room complaining of neck and head pain for the past day (Tr. at 275-280). Plaintiff had been in a go-cart and it rolled. He was

thrown, and he hit his head.  He lost consciousness for about 2
minutes.  The functional limitation was minimal.  All other
systems were reviewed and no other complaints were made by
plaintiff.  On exam he was noted to be alert and oriented times
three with no focal neurological deficits.  He had muscle spasm
and some tenderness in his neck.  A CT scan was normal.  He was
assessed with neck sprain and was given pain medication and a
non-steroidal anti-inflammatory with no refills.

On February 21, 2009, plaintiff went to the emergency room
and said he was coughing up blood at work, "supervisor wants drug
screen" (Tr. at 270-274).  Plaintiff reported smoking a half a
pack of cigarettes per day and using alcohol socially.  "The
degree of severity is mild. . . .  The risk factor is smoking."
All other symptoms were reviewed and plaintiff denied any other
problems.  He did not denied any mental issues.  His physical
exam was normal.  He was noted to be alert and oriented times
three and in no acute distress, the remainder of his neurological
exam was normal.  A CT scan was done to rule out pulmonary edema,
none was present but a 3.5 mm nodule was noted.  He was assessed
with bronchitis and a lung nodule.  He was given antibiotics and
was referred to Eric Sollars, M.D.  "[A]dvised (strongly) to stop
smoking."

On February 24, 2009, plaintiff saw Eric Sollars, M.D., as a
new patient (Tr. at 240).  He had been seen in the emergency room

three days earlier for coughing up blood. He had been smoking for more than ten years, and he had a history of bronchitis. Plaintiff also reported that he gets dried blood in his nose, and that he may have broken his nose a long time ago. And finally, he reported headaches. Plaintiff was smoking a half a pack of cigarettes per day and was a social drinker. Plaintiff's lungs were clear, his neurological exam was intact. He was assessed with bronchitis but no treatment was provided.

On March 19, 2009, plaintiff went to the emergency room complaining that "his left knee starts hurting about once a month after he does a lot of activity." (Tr. at 265-269). The degree of pain was moderate and it had lasted two days, the degree of dysfunction was none. He denied any other problems including mental problems. He was oriented times four, and no abnormal observations with regard to his behavior were noted. Plaintiff continued to smoke. His exam was normal except he had pain, tenderness, and some limitation in range of motion of his knee. X-rays of his knee were normal. He was assessed with knee sprain.

On April 4, 2009, plaintiff went to the emergency room complaining of nausea, vomiting, and abdominal discomfort (Tr. at 259-264). Plaintiff denied any other problems including mental problems, even though his alleged onset of disability due to his mental condition was 6 days away. His physical exam was entirely

normal.  He was assessed with viral illness and was given Phenergan rectal suppositories for nausea.

April 10, 2009, is plaintiff's alleged onset date.

On June 13, 2009, plaintiff went to the emergency room complaining of a left hand injury (Tr. at 256-258).  A jack slipped out from a car and fell across his left thumb.  Plaintiff had minimal bleeding from the laceration, and the degree of dysfunction was listed as "negative".  All other systems were reviewed and plaintiff denied any other problems of any kind, including mental, even though he now claims he became disabled two months earlier due to his mental impairment.  Plaintiff continued to smoke and use alcohol.  He was noted to be in no acute distress.  His physical exam was normal with the exception of the thumb laceration.  X-rays showed no fracture.  He was given an antibiotic and Lortab (a narcotic pain medication, 12 tablets with no refills) and was told to follow up with Dr. Sollars in 7 to 10 days to have the stitches removed.  There are no follow-up records, and plaintiff sough no medical care for the next six months.

On December 25, 2009, plaintiff went to the emergency room complaining of rectal bleeding and coughing up blood (Tr. at 239, 252-255).  He reported having had a CT scan six months earlier and having been told that he had a spot on his lung.  His medical history consisted of only left shoulder surgery in the past and

episodes of coughing up blood about six months ago.  He did not report any mental problems.  Plaintiff continued to smoke.  His physical exam was entirely normal.  He had chest x-rays which were normal.  His lab work was all normal.  Dr. Andrew Hyatt recommended that plaintiff have a CT scan due to his report of a spot on his lung six months ago, but plaintiff refused and the scan was not performed.  Dr. Hyatt noted he was unable to determine the cause of plaintiff's allegation of coughing up blood, and that the only abnormal finding at the hospital was blood in plaintiff's stool which was likely caused by hemorrhoids.  Plaintiff's symptoms had completely resolved in the ER, and he was told to follow up with Dr. Sollars in the next one to three days.  No abnormal mental symptoms were observed by anyone who dealt with plaintiff during this hospital visit. Plaintiff did not follow up with Dr. Sollars.

On March 16, 2010, plaintiff applied for disability benefits.

On March 23, 2010, J. Curtis of Disability Determinations met face to face with plaintiff (Tr. at 128-131).  Plaintiff reported that he had never been given any special work considerations.  The interviewer observed no difficulty with hearing, reading, breathing, understanding, coherency, concentrating, talking, answering, sitting, standing, walking,

seeing, using his hands, or writing.  "The claimant was nice and pleasant to work with.  No disabilities were noticed."

On March 24, 2010, plaintiff went to the emergency room complaining of nausea, vomiting, and abdominal pain for the past two days (Tr. at 248-251).  Plaintiff denied any mental problems even though a couple days before he had filled out paperwork claiming to be completely disabled due to a mental impairment.  Plaintiff's physical exam was entirely normal.  His neurological exam was normal, and he was noted to be alert and oriented times three and in no acute distress.  Plaintiff was assessed with viral gastroenteritis and was given Phenergan for nausea.

On March 30, 2010, plaintiff completed a Missouri Supplemental Questionnaire (Tr. at 184-186).  He reported that he plays video games, puzzles and plays on a computer for an hour at each sitting.  He is currently able to drive.  That same day plaintiff completed a Function Report (Tr. at 152-159).  When asked to describe what he does from the time he wakes up until he goes to bed, plaintiff wrote, "Go to the bathroom, eat, brush teeth, get dressed, set [sic] around and be depressed wish I had my own place so people wouldn't bitch at me all the time and go back to bed."  Plaintiff has no problems with personal care, he needs no reminders for personal needs or for taking medication, and he prepares his own meals daily.  He can clean, do laundry and take out the trash.  He goes out twice a day, drives a car,

and can go out alone.  He shops in stores for food and personal
items.  He is able to pay bills, handle a savings account, count
change, and use a checkbook or money orders.  His hobbies include
watching television and building model cars.  He does not spend
time with others (this contradicts his report to psychologist
Glenn Schowengerdt, his administrative hearing testimony, and the
report of his grandmother).  Plaintiff does not like to talk to
people very long, and when he does he feels like they are looking
at him and making fun of him.  His impairment affects his ability
to talk, hear, remember, complete tasks, concentrate, understand,
follow directions, and get along with others.  "I don't like to
talk to people.  I don't like to listen to them.  Sometimes I
don't even listen to them.  I don't like to be around a lot of
people.  I hate people telling me what to do."  Plaintiff
reported that he has been fired from every job he has had.

That same day, plaintiff's grandmother, Grace Shaw,
completed a Function Report Adult – Third Party (Tr. at 161–168).
Plaintiff was living with her at the time.  She described his day
as follows:  "He gets up, eats, then leaves to do what he needs
to do that day.  Then comes home, takes shower and goes to bed."
She also noted that plaintiff "has had the illness his whole
life.  Nothing has changed."  Plaintiff has no problems with
personal care.  He prepares his own meals every day.  He can do
laundry, clean, do household repairs, and mow.  He goes out every

day, either riding in a car or driving.  He is able to go out
alone, he can shop in stores.  His hobbies include playing video
games, tinkering with car parts, watching television, talking on
the phone, and doing outdoor activities.  He does them well and
every day.  He talks on the phone with friends and spends time
outdoor with friends almost every day.  "His social activities
seem to increase lately because he seems to be very hyper and
needs to release the energy."  Plaintiff's impairments affect his
ability to understand, talk, follow instructions, complete tasks,
concentrate and get along with others.  His impairment does not
affect his ability to remember.  Ms. Shaw reported that plaintiff
is very hyper and has mood swings, and this "has been so since he
was five."

On April 6, 2010, plaintiff saw Glenn Schowengerdt, M.S.,
for a psychological evaluation in connection with his application
for government benefits (Tr. at 203-206, 214-217).  He arrived
early for his appointment, his hygiene was fine, his posture was
good, eye contact was good, comprehension was within average
limits, there was no evidence of long or short term memory loss,
intellectual capacity was estimated to be within the average
range.  He exhibited no gross fluctuations in mood and was able
to express a full range of affect.  He exhibited no evidence of
delusional thinking, and his predominant mood throughout the
interview was "playful."

Plaintiff "stated he had a long history of psychiatric treatment" including seeing "many different psychiatrists" and treatment with "many different medications." However, there is no evidence of this in the record.

Plaintiff said his current psychiatric complaints are that he will "blurt out" things verbally, he has a short temper, and there are times when he thinks everyone is talking about him. His only physical health concern was a lesion on one of his lungs. He was taking no medication of any kind.

Plaintiff was raised by his grandparents. "He stated all the people he has hung out with in the recent past are either dead or in prison now." He began using hard liquor in middle school. He continued drinking and skipping school in high school. He had two children while he was still a teenager. He lived with a girl friend for a few years but they broke up and he moved back in with his grandparents in 2008. Plaintiff said he has only had temporary jobs. "He stated he has quit a few jobs but usually winds up getting fired from his jobs. He gets fired for being 'mouthy' towards his bosses." Plaintiff described his day as starting anywhere between 9:00 a.m. and 2:00 p.m. "He then gets dressed, and gets something to eat. After that, he goes to hang out with some of his friends in a local garage. Then he comes home and sits around. He stated if he gets bored, or depressed, he goes out to get drunk." Mr. Schowengerdt

assessed attention deficit hyperactivity disorder, antisocial
personality traits, and lung lesion. Plaintiff's GAF was
assessed at 50.

On April 14, 2010, plaintiff was seen by David Cathcart,
D.O., in connection with his application for Medicaid (Tr. at
207-209). Plaintiff reported coughing up blood and having nose
bleeds since about 2007 or 2008, but he had not had any follow up
since then. He last coughed up blood about a month ago. He was
not taking any kind of medication. Plaintiff was a current
smoker and he continued to use alcohol. "In general this is a
pleasant well-developed, well-nourished, 25-year-old male who is
in no acute distress. He is alert, oriented and cooperative.
His hygiene is good. I would estimate his level of intelligence
to be average. . . . affect is normo-affective." Chest x-rays
were done, and Dr. Cathcart observed no abnormalities,
infiltrates or masses on plaintiff's lungs. He has a "normal
medical exam."

Dr. Cathcart found that plaintiff can sit for six hours per
day, stand and walk six hours per day, lift 50 pounds
occasionally and 25 pounds frequently, and had no limitations in
pushing or pulling outside of the lifting restriction. Plaintiff
had no communicative limitations and no restrictions in bending,
stooping, kneeling, crouching, crawling, climbing, or balancing,
and he had no environmental limitations. Dr. Cathcart found no

medical limitation "unless possibly one would consider [plaintiff's reported] attention deficit hyperactivity disorder" as a barrier to working. He was "certainly not incapacitated or unemployable."

On June 4, 2010, Lester Bland, Psy.D., completed a Psychiatric Review Technique finding that plaintiff suffers from mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation (Tr. at 219-229). In support of his findings, he noted that plaintiff has a high school education, he has past substantial gainful employment that ended when he was fired, he was not in special education and is estimated to be functioning in the low average range of intelligence, he has had no treatment for any mental impairment and is not currently on any medication. Plaintiff is capable fo self care, cleaning, laundry, simple chores, shopping, paying bills, counting change, and managing bank accounts. He hangs out with friends during the day, but does not like crowds, authority figures or being told what to do. During an exam in connection with his disability case, he was noted to have adequate cognitive skills, was free from mood swings or delusional thinking, he had difficulty with attention and concentration, and he presented with antisocial traits.

That same day, Dr. Bland completed a Mental Residual Functional Capacity Assessment (Tr. at 230-232). He found that plaintiff was not significantly limited in the following:

- The ability to remember locations and work-like procedures

- The ability to understand and remember very short and simple instructions

- The ability to carry out very short and simple instructions

- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances

- The ability to sustain an ordinary routine without special supervision

- The ability to make simple work-related decisions

- The ability to ask simple questions or request assistance

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

He found that plaintiff was moderately limited in the following:

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to maintain attention and concentration for extended periods

- The ability to work in coordination with or proximity to others without being distracted by them

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to interact appropriately with the general public

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

On July 10, 2010, plaintiff saw Eric Sollars, M.D. (Tr. at 235). His chief complaint was occipital headaches which resolve in about five minutes, and gastroesophageal reflux disease symptoms (excess stomach acid). This was plaintiff's second visit with Dr. Sollars, the first having occurred a year and a half earlier. Plaintiff continued to smoke cigarettes and use alcohol. No exam was perform, no observations were recorded. Plaintiff was assessed with migraine headache and sinus infection. He was not on any medications, and none were prescribed. Despite having alleged in his application that he had been disabled for the past year and three months due to a mental impairment, plaintiff did not mention any mental health

issues to Dr. Sollars, and Dr. Sollars did not observe any.

On July 12, 2010, plaintiff had a CT scan of his head due to his complaint of migraine headache (Tr. at 238). Plaintiff had a mucous retention cyst in his sinuses, mild deviation of the nasal septum, and no other abnormalities.

On October 1, 2010, plaintiff saw Dr. Sollars (Tr. at 234). His chief complaint was listed as ADHD combined with "auditory hallucinations, racing thoughts, paranoid (sometimes will [illegible] of 3-4 days at a time because he doesn't want to be around anyone), anger issues." Plaintiff stated that the last time he had taken any medications was ten years ago. He also reported migraines headaches. Plaintiff continued to smoke and drink alcohol.

This was plaintiff's third visit with Dr. Sollars, and it was the first visit during which he mentioned any mental concerns. Dr. Sollars performed a physical exam which was normal. There were no abnormal findings anywhere on this record, including no abnormal mental findings. Dr. Sollars assessed ADHD, hallucinations and psychosis. He prescribed Risperdol (treats schizophrenia and bipolar disorder) and told plaintiff to keep his psychiatric appointment. There is no further mention in this record of a psychiatrist, and there is no dispute that plaintiff never saw a psychiatrist or any other mental health professional.

On October 19, 2010, Dr. Sollars completed a Medical Source Statement – Mental (Tr. at 242-243). Plaintiff did not have an appointment with Dr. Sollars that day, so this form was completed based on Dr. Sollars's treatment records which contained three visits, only one of which dealt with a mental issue. Dr. Sollars found that plaintiff was moderately limited in the following:

- The ability to make simple work-related decisions
- The ability to ask simple questions or request assistance

He found that plaintiff was markedly limited in the following (markedly limited was defined as "more than moderate, but less than extreme resulting in limitations that seriously interferes [sic] with the ability to function independently"):

- The ability to remember locations and work-like procedures
- The ability to understand and remember very short and simple instructions
- The ability to carry out very short and simple instructions
- The ability to maintain attention and concentration for extended periods
- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances
- The ability to work in coordination with or proximity to others without being distracted by them
- The ability to interact appropriately with the general public

19

- The ability to accept instructions and respond appropriately to criticism from supervisors

- The ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness

- The ability to travel in unfamiliar places or use public transportation

- The ability to set realistic goals or make plans independently of others

He found that plaintiff was extremely limited in the following (extremely limited was defined as "impairment level preclude [sic] useful functioning in this category):

- The ability to understand and remember detailed instructions

- The ability to carry out detailed instructions

- The ability to sustain an ordinary routine without special supervision

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods

- The ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes

- The ability to respond appropriately to changes in the work setting

- The ability to be aware of normal hazards and take appropriate precautions

That same day, Dr. Sollars completed a Medical Source Statement – Physical (Tr. at 245–246). He found that plaintiff could lift no more than 5 pounds frequently and less than 5

20

pounds occasionally, which makes no sense.  He found that plaintiff could stand or walk for 30 minutes at a time and for 3 hours per day.  He fond that plaintiff could sit for 30 minutes at a time and for a total of 3 hours per day.  His ability to push or pull was limited, but Dr. Sollars did not describe the limitation as directed by the form.  He found that plaintiff could only occasionally climb, balance, stoop, kneel, crouch, crawl, reach, handle, finger, feel, see, speak, or hear.  He found that plaintiff should avoid any exposure to extreme cold or heat, wetness, humidity, dust, fumes, vibration, hazards, and heights.  Despite having found that plaintiff could only sit, stand and walk for a total of 6 hours per day, he did not indicate that plaintiff needed to lie down or recline at all during the day despite there being a section on the form asking for this information.

On November 1, 2010, plaintiff saw Dr. Sollars for a follow up (Tr. at 288).  Plaintiff reported that he "continued" to have auditory hallucinations but they were much improved, and mood swings were somewhat better since beginning Risperdal.  Under past history, the following was written:  "ADHD history, psychosis, hallucinations."  Plaintiff was noted to be a smoker and a drinker.  He was assessed with schizophrenia improving. His Risperdal was refilled.

On January 11, 2011, plaintiff saw Dr. Sollars for a follow up (Tr. at 287). The form shows that plaintiff was informed by the pharmacy that he needs a diagnosis for Missouri Medicaid as to why he is taking Risperdal. Under "past history", ADHD and schizoaffective disorder were written. Plaintiff was noted to be a smoker and a drinker. No exam was performed. Dr. Sollars assessed psych history, schizophrenia, and bipolar disorder. However, there were no symptoms either observed by Dr. Sollars or reported by plaintiff. His Risperdal was refilled.

On April 12, 2011, plaintiff saw Dr. Sollars for a follow up (Tr. at 286). Plaintiff reported that Risperdal did not seem to be effective. Plaintiff did not feel as relaxed. He was having no auditory or visual hallucinations. He reported feeling hyperactive. Under "past history" the following was written: "ADHD, Schizoaffective dr [disorder]". Plaintiff continued to smoke and use alcohol. No exam was performed. No assessments were made. Plaintiff's Risperdal was refilled.

On June 28, 2011, plaintiff saw Dr. Sollars for a follow up (Tr. at 285). "Risperdal helps good." Plaintiff was noted to be a smoker and a drinker. No exam was performed. No assessments were made. Plaintiff's prescription for Risperdal was refilled.

*C.*    *SUMMARY OF TESTIMONY*

During the September 9, 2011, hearing, plaintiff testified; and Marianne K. Lumpe, a vocational expert, testified at the request of the ALJ.

**1.    Plaintiff's testimony.**

At the time of the hearing plaintiff was 27 years of age and is currently 29 (Tr. at 36).  Plaintiff is receiving Medicaid benefits (Tr. at 34).  He alleges he became disabled on April 10, 2009, but when asked why he selected that date, he said, "I don't know" (Tr. at 36).  When plaintiff was asked if he had tried to work since that date, plaintiff laughed and said, "No" (Tr. at 36-37).  When asked why he had not tried to work since then, plaintiff said, "I don't know" (Tr. at 37).

Plaintiff previously worked mixing chemicals for a pesticide and herbicide company (Tr. at 37).  He was fired from that job -- "I flew off the handle and lost my attitude" (Tr. at 37).  He was not on any medications at the time (Tr. at 37).  Plaintiff also worked for Kelly Services cutting grass (Tr. at 37-38).

Plaintiff graduated from high school (Tr. at 38).  He went to Maryville Tech for collision repair but did not complete the courses (Tr. at 38).

Dr. Sollars is plaintiff's family doctor, and he prescribes Risperdal which helps somewhat (Tr. at 38).  Plaintiff is a

23

little more relaxed than he was before (Tr. at 39).  He still has
depression, sometimes he hears voices, and sometimes he cries for
no reason (Tr. at 39).  The last time he mentioned this to Dr.
Sollars, his dose of Risperdal was increased but that did not
help (Tr. at 39).  Plaintiff has not seen a psychiatrist and
could not say why (Tr. at 39).  He is physically healthy (Tr. at
39).

When plaintiff was asked why he is unable to work, he said,
"It's hard for me to concentrate and remember things at times,
and just the littlest things set me off.  I mean, one minute I'm
fine, and then another minute I might be irate." (Tr. at 39).
When he was asked if there were any other reason, he said that he
could not think of one (Tr. at 39-40).  Going to the store gets
on plaintiff's nerves and makes him mad because he does not like
to wait and have to go around everybody (Tr. at 43).  This does
not happen to him when he goes out drinking with his friends,
however (Tr. at 43-44).

Plaintiff is able to drive a car, and he drove the 60 miles
from his home to the hearing (Tr. at 40).  He runs errands at the
post office and the store for his grandparents (Tr. at 40).  He
goes out to eat with his grandparents, and he goes shopping with
them (Tr. at 40-41).  Plaintiff does not help around the house,
but he does not know why (Tr. at 41).  Plaintiff drinks alcohol

on the weekends (Tr. at 41).  He goes out with friends weekly
(Tr. at 41).

Plaintiff has headaches about once a week that last from 10
to 30 minutes (Tr. at 42).  He takes over-the-counter Ibuprofen
which cures his headaches (Tr. at 42).

Plaintiff sometimes has paranoid thoughts, and when asked to
describe them, he said, "I don't know, it's hard to explain.
Like, it seems like everybody's out to get me sometimes.  Like I
don't want to be around nobody 'cause I feel like everybody's
talking about me." (Tr. at 42).  Yet, plaintiff does not have any
problems going out with his friends, and he usually stays out
with them for several hours at a time (Tr. at 42-43).

## 2.  **Vocational expert testimony.**

Vocational expert Marianne Lumpe testified at the request of
the Administrative Law Judge.  Plaintiff's past relevant work
includes chemical mixer/operator which is semi-skilled with an
SVP of 4 and it is medium (Tr. at 45).  Plaintiff also worked as
a landscape specialist which is unskilled and medium (Tr. at 46).
Plaintiff also worked as a material handler through a temporary
agency, and that job was semi-skilled with an SVP of 3 and it was
performed at the heavy exertional level (Tr. at 47).

The first hypothetical involved a person who could lift 25
pounds frequently and 50 pounds occasionally; stand six to eight
hours a day; sit six to eight hours a day; could do no work with

25

the public; and would be precluded from teamwork -- he could work in the proximity of others, but he would need job tasks that he could perform essentially on his own (Tr. at 47-48). The vocational expert testified that such a person could perform plaintiff's past relevant work as a chemical mixer or a landscape specialist (Tr. at 48). There are 12,000 landscape specialist jobs in Missouri and 800,000 in the country (Tr. at 48). The landscape specialist job requires no more than simple tasks (Tr. at 48-49).

The next hypothetical was the same as the first except the person would be limited to routine tasks only (Tr. at 49). The chemical operator position is an SVP of 4, so the person could not perform that; however, the person could work as an industrial cleaner, medium, unskilled with 2,800 jobs in Missouri and 350,000 in the country, or a kitchen helper, medium unskilled with 3,000 in Missouri and 350,000 in the country, or a cleaner of lab equipment, medium unskilled with 500 in Missouri and 150,000 in the country (Tr. at 49-50).

The final hypothetical incorporated the Medical Source Statement - Mental completed by Dr. Sollars, and the vocational expert testified that a person with those limitations could not work (Tr. at 50-51).

## V.  FINDINGS OF THE ALJ

Administrative Law Judge Susan Blaney entered her opinion on October 28, 2011 (Tr. at 9–25).  Plaintiff's last insured date is December 31, 2014 (Tr. at 11).

Step one.  Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 11).  The ALJ noted that plaintiff was unable to explain why he chose April 10, 2009, as his alleged onset date, and he also was unable to explain why he had not tried to work since then (Tr. at 12).

Step two.  Plaintiff's severe impairment consists of a combination of the following:  "a childhood history of attention deficit hyperactivity disorder, possibly ongoing as an adult, but such is unclear from the medical evidence of record; possible antisocial personality traits per a one-time assessment provided by a consultative psychological examiner; and a possible affective or psychotic disorder, not diagnosed in medical treatment records until October 1, 2010, about 1 1/2 years subsequent to the alleged onset of disability." (Tr. at 12).  The ALJ noted that plaintiff did not claim any severe physical impairment and the evidence does not support that one exists (Tr. at 12–13).

Step three.  Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 13–20).

Step four.  Plaintiff retains the residual functional capacity to perform a full range of work at all exertional levels but is restricted to jobs that require performance of no more than simple tasks and is precluded from jobs that require teamwork or direct interactions with the public during the performance of job duties (Tr. at 20).  With this residual functional capacity, plaintiff can perform his past relevant work as a landscape specialist as that job is generally performed within the national economy (Tr. at 22).  Although plaintiff said he only performed that job for four months, the ALJ found that it was performed at the substantial gainful activity level (Tr. at 23).

Step five.  Even if plaintiff's work as a landscape specialist were not substantial gainful activity, that job exists in significant numbers in the state and country and therefore at step five plaintiff would be able to perform such a job (Tr. at 23).  He could also work as an industrial cleaner, a kitchen helper, or a lab equipment cleaner, and all of these jobs are available in significant numbers (Tr. at 23-24).

## VI.  OPINION OF DR. SOLLARS

Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinion of Dr. Sollars in the Medical Source Statement Mental.  "Dr. Sollars treated Mr. Shaw from February 24, 2009 to June 28, 2011.  During that period Dr.

28

Sollars saw him seven times.  Based on his treatment, Dr. Sollars completed a Medical Source Statement Mental on October 19, 2010. Dr. Sollars assessed Mr. Shaw with several marked and extreme limitations in areas of concentration and working with others and completing a normal workday or workweek."  Interestingly, even though Dr. Sollars also rendered an opinion findings plaintiff significantly unable to do most physical activities, including the fact that he could only sit, stand and lie down for part of a normal workday and could lift less than 5 pounds which would clearly make him disabled, plaintiff does not argue that the ALJ erred in failing to giving controlling weight to this opinion of Dr. Sollars.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques.  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005).  If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion including length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability, particularly by medical signs and laboratory findings;

consistency with the record as a whole; and other factors, such as the amount of understanding of Social Security disability programs and their evidentiary requirements or the extent to which an acceptable medical source is familiar with the other information in the case record. 20 C.F.R. §§ 404.1527, 416.927.

The ALJ had this to say about Dr. Sollars's opinion:

A review of the medical records shows that claimant first presented to Dr. Sollars, a family practitioner, on February 24, 2009. His complaint at that time was his recent visit to the emergency room for coughing up blood. Upon examination, Dr. Sollars reported claimant demonstrated 98% blood oxygen saturation on just room air, clear lungs, and otherwise normal findings. He diagnosed bronchitis, the same diagnosis recently rendered by the emergency room physician, but he did not prescribe any additional treatment. Importantly, claimant made no complaint of any mental symptom or mental problem whatsoever at this encounter with his new primary treating physician. Dr. Sollars' treatment note for this visit does not reflect any abnormal mental finding whatsoever.

* * * * *

On July 10, 2010, claimant presented to Dr. Sollars for the second time, not with complaints of mental problems but only with complaints of episodic headaches. He reported to Dr. Sollars that his most recent headache resolved within 5 minutes. He also stated he had gone to an emergency room 6 weeks earlier with complaints of chest pain and was diagnosed with "GERD" (gastroesophageal reflux disease). Dr. Sollars' treatment note reflects essentially normal findings. He diagnosed headaches, as well as sinusitis.

The medical evidence reveals claimant's first complaint of any significant mental problems to any treating physician occurred on October 1, 2010, when he next saw Dr. Sollars. The treatment note set forth claimant's subjective reports of his "history of" ADHD and subjective complaints of current symptoms including auditory hallucinations, racing thoughts, paranoia, social avoidance, and anger control problems, as well as his admission that "the last time he

took meds" for his behavioral problems was "10 years ago." There are no mental status findings whatsoever. Dr. Sollars diagnosed "ADHD history", "?Hallucinations", and "Psychosis". He prescribed Risperdal to treat claimant's complaints of mental symptoms. Dr. Sollars [did] not examine[] claimant again, but he nonetheless completed a questionnaire assessment of claimant's capacity to perform basic mental work-related activities just a few days later, on October 19, 2010, at which time he offered the opinion that claimant was markedly or extremely limited in nearly every area of functioning. The limitations endorsed on this form are found not to be supported by the records in this case. This was the first time claimant complained of any mental health symptoms to Dr. Sollars, no mental status exam was performed, and given the brief treatment relationship Dr. Sollars had with claimant prior to completion of the form it appears Dr. Sollars was jumping to a conclusion too quickly. Additionally, Dr. Sollars is not a mental health specialist, but claimant's family doctor.

Dr. Sollars also completed a form endorsing physical limitations for claimant, in which Dr. Sollars states claimant is able to lift less [than] 5 pounds, stand/walk only 3 hours a day and sit only 3 hours a day. The inference is that claimant must therefore lie down the remaining two hours a day [although Dr. Sollars did not indicate on the form that plaintiff needed to lie down or recline despite there being a section asking about that very thing.] Dr. Sollars further states claimant can only occasionally handle, reach, finger and feel. This opinion is given little weight because it conflicts with claimant's own testimony at the hearing that he is physically healthy, as well as with the medical evidence summarized above, including Dr. Sollars' own treatment notes for the two office appointments claimant had with him prior to completion of the form and the treatment notes of other examining and treating doctors summarized above.

* * * * *

In reaching the mental residual functional capacity defined above, controlling weight may not be accorded Dr. Sollars' October 2010 questionnaire assessments of claimant's retained capacity to perform basic mental work-related activities, not only because he is not a mental healthcare specialist, but also because his assessments that claimant is "markedly limited" or "extremely limited" in 18 of 20

areas assessed therein is not supported by any detailed
rationale or cite to medically determinable sign or finding
whatsoever.  Further, he completed that questionnaire just a
few days after claimant made his initial complaint of mental
problems to him, specifically on October 1, 2010,
essentially 1 1/2 years subsequent to the alleged onset date
of disability, and that treatment note does not reflect any
mental status finding, but rather only his diagnostic
impressions specifying a diagnosis of ADHD [which] was based
on claimant's subjective reports of a history of such and
that he questioned diagnostic impressions of hallucinations
and related psychosis regarding symptoms claimant endorsed
at that time.  Further, he did not reconcile those
assessments with medical records dated during essentially
the first year of the relevant period at issue wherein
claimant specifically and repeatedly denied any significant
mental problem and reportedly demonstrated essentially
normal mental status findings and functioning, the good
overall mental status findings reported by the April 2010
consultative psychological examiner, the mental status
findings and medial opinion provided by Dr. Cathcart, or
claimant's admissions in some questionnaires of record that
reflect his admissions of substantial retained mental
functioning even though he was admittedly not undergoing any
mental healthcare treatment at that time.

In disability questionnaires of record, claimant and his
grandmother essentially alleged claimant had a childhood
history of ADHD, but claimant also admitted he was not
taking any medication at that time and had not undergone any
mental healthcare treatment for several years prior thereto.
The regulations promulgated under the Social Security Act,
as amended, direct that an individual's subjective reports
may not alone establish a medically determinable impairment,
but rather direct that there must be objective or clinical
signs and findings established by medically acceptable
diagnostic techniques to do so.  Although claimant alleges
April 10, 2009, as the onset date of disability in his
applications and in a related disability questionnaire, the
medical evidence dated during essentially the first year of
the relevant period at issue reflects his repeated denials
of any significant mental problem and treating physicians'
repeated reports that he demonstrated essentially normal
physical and mental status findings and functioning aside
from the acute and transitory physical symptoms for which he
presented, which is widely insufficient under the
regulations to establish medically determinable mental

pathology of disabling severity as claimant alleges in this appeal for that same timeframe.

Claimant's repeated denials of any significant mental problems to treating physician[s] during essentially the first year of the relevant period at issue and the normal mental status findings reported by treating physicians during this timeframe, as well as the actual mental status findings reported by consultative psychologist Schowengerdt and Dr. Cathcart in April 2010, are wholly inconsistent with the multiple "markedly limited" and "extremely limited" assessments of claimant's retained mental functioning rendered by Dr. Sollars 6 months later as reflected in [his Medical Source Statement]. Additionally, Dr. Sollars' October 2010 questionnaire assessments were rendered only after claimant first complained of mental symptoms to him and claimant admitted to him during his sparse follow-up encounters thereafter that Risperdal helped improve his mental symptoms and overall mental functioning, which greatly detracts from the extreme limitations assessed in [Dr. Sollars's Medical Source Statement – Mental]. In disability questionnaires and at the hearing, claimant admitted that he engages in a variety of activities that inherently require prolonged attention and concentration and memory functioning. Moreover, despite claimant's allegations of a dislike of being around others, a proclivity to avoid others, and poor anger control, he admitted that he has friends, that he regularly goes out with friends on weekends without experiencing social difficulties with them, that other people do not take him to the "boiling point" when he is out with friends, and that he is able to run errands and perform other chores for himself and his grandparents that require him to maintain adequate social interactions. Very little weight is otherwise accorded to Dr. Sollars' unsupported assessments in [his Medical Source Statement] and far greater weight is accorded to actual mental status findings reflected in multiple examination reports of record.

(Tr. at 14, 18, 21–22).

The ALJ's opinion on this issue is extremely thorough. Plaintiff consistently denied any mental problems for the first year and a half of his period of alleged disability. He claimed

to Dr. Sollars that he was experiencing mental issues, and Dr. Sollars made diagnoses consistent with plaintiff's complaints despite having observed no abnormalities and having heard no complaints of mental difficulties until the one visit preceding a request to fill out paperwork for plaintiff's disability case. It is also significant that the limitations found by Dr. Sollars in the Medical Source Statement – Mental were by far more restrictive than even plaintiff's allegations during that one visit.

Although at the time the MSSM was completed, Dr. Sollars had been "treating" plaintiff for 1 year and 8 months, he had only seen plaintiff three times during that period and plaintiff denied any mental issues on two of those three visits. The only visit during which plaintiff alleged any mental difficulties was the visit immediately preceding his request that Dr. Sollars complete disability forms for plaintiff.

The nature and extent of the treatment relationship further supports the ALJ's finding. Dr. Sollars had not treated plaintiff for any mental impairment prior to rendering his opinion. It is significant to note that Dr. Sollars did not even wait to see if the Risperdal he prescribed improved any of plaintiff's symptoms before completing the disability paperwork. Further, none of the functional abilities rated in the forms were

discussed by plaintiff or Dr. Sollars during the one visit during which a mental impairment was alleged.

As the ALJ thoroughly discussed there is no supportability, particularly by medical signs and laboratory findings, for Dr. Sollars's opinion.  Plaintiff never even alleged difficulties with any specific functional ability.  Significant is the fact that Dr. Sollars also severely limited plaintiff's physical abilities at the same time, and plaintiff readily admits that he has no physical difficulties whatsoever.  Dr. Sollars did not even match his opinion with plaintiff's allegations, he merely limited plaintiff about as severely as possible in both mental and physical abilities, rather than giving any real consideration to the limitations he assessed in those forms.

As the ALJ thoroughly discussed, there is no consistency between Dr. Sollars's opinions and the record as a whole. Plaintiff consistently denied any mental problems, including during the first year and a half of his period of alleged disability based on a mental impairment.  No medical professional ever observed any mental symptoms.  Even plaintiff's grandmother reported that plaintiff is gone most of the day, doing things he needs to do.  Dr. Sollars's finding that plaintiff is "markedly limited" in his ability to maintain basic standards of neatness and cleanliness is directly contracted by every medical record (except his own, which does not ever mention this) that

plaintiff's hygiene was fine.  Plaintiff was described as being cooperative and maintaining a "joking" attitude –– no one ever observed plaintiff acting any way other than normal (i.e., no one ever noted that plaintiff appeared angry or hyper or depressed or tearful).

Based on all of the above, I find that the substantial evidence in the record clearly supports the ALJ's finding that Dr. Sollars's opinion in the Mental Source Statement – Mental was not entitled to controlling weight.

## VII. PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

Plaintiff argues that the ALJ erred in assessing plaintiff's residual functional capacity without explaining in detail what medical and non-medical evidence she utilized.  "The ALJ did not include a narrative discussion of how evidence supports each conclusion, [or] cite specific medical and non-medical evidence." This argument is without merit.  The ALJ's opinion in this case is one of the most thorough I have reviewed.  She compared the opinions of all of the medical professionals, the medical records (both treating and consultative), plaintiff's allegations, plaintiff's admissions, and observations of others (both medical and non-medical), before assessing plaintiff's residual functional capacity.

A claimant's residual functional capacity is the most he can do despite the combined effect of his credible limitations.  20

C.F.R. §§ 404.1545 and 416.945.  It is the claimant's burden to prove his residual functional capacity, and it is the ALJ's responsibility to determine the residual functional capacity based on all relevant evidence in the record.  Harris v. Barnhart, 356 F.3d 926, 929 (8th Cir. 2004); McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000).

As discussed above, the ALJ properly rejected the opinions of Dr. Sollars.  The remainder of the evidence in the record supports the ALJ's residual functional capacity assessment. Plaintiff consistently denied any mental difficulties to treating medical professionals, and those denials occurred sometimes within days of plaintiff claiming in disability paperwork that he was disabled due to mental limitations.  Multiple medical professionals consistently observed no mental limitations on plaintiff's part; they consistently noted his denials of any mental issues; there are contradictions in the record between plaintiff's allegations in his paperwork, to his doctors, and in his testimony at the hearing; plaintiff did not allege any mental issues to his treating doctors until he asked his primary care doctor to complete disability paperwork; plaintiff's doctor filled out the paperwork in a manner that was entirely inconsistent with his own observations or plaintiff's complaints; and the MSSM was completed without the benefit of any testing and before Dr. Sollars determined whether his prescribed treatment

37

would improve plaintiff's condition.  The substantial evidence in the record as a whole supports the ALJ's residual functional capacity assessment.

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


_/s/ Robert E. Larsen_
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 17, 2014